## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

| | | |
|---|---|---|
| Vanessa Annette Owings, | ) | |
| | ) | |
| Plaintiff, | ) | Civil Action File No.: |
| | ) | |
| v. | ) | |
| | ) | |
| Equifax Information Services LLC; | ) | **COMPLAINT** |
| Trans Union LLC; Flagstar Bancorp, | ) | **WITH JURY TRIAL DEMAND** |
| Inc.; and Sterling Jewelers Inc. | ) | |
| (Delaware) a/k/a and d/b/a Kay | ) | |
| Jewelers, | ) | |
| | ) | |
| Defendants. | ) | |

## PRELIMINARY STATEMENT

1.      The United States Congress has found the banking system is dependent upon fair and accurate credit reporting. Inaccurate credit reports directly impair the efficiency of the banking system, and unfair credit reporting methods undermine the public confidence, which is essential to the continued functioning of the banking system. Congress enacted the Fair Credit Reporting Act, 15 U.S. Code § 1681, *et seq*. (the "FCRA") to ensure fair and accurate reporting, promote efficiency in the banking system, and protect consumer privacy.

1

2.     Under the FCRA, consumer reporting agencies are charged with two primary duties: the duty to follow reasonable procedures to assure maximum possible accuracy of information when preparing consumer reports; and the duty to reasonably reinvestigate consumers' disputes of inaccurate information, and then appropriately correct or modify the disputed information. A consumer reporting agency's duty to reasonably reinvestigate consumers' disputes of inaccurate information explicitly includes the duty to notify the furnisher of the disputed information. This is because the furnisher of the disputed information stands in a better position to make a thorough investigation of the disputed information than the credit reporting agency.

3.     Under the FCRA, furnishers of information have two similar primary duties: to report complete and accurate information regarding the consumers about whom the furnishers report; and, upon receiving notice of a consumer's dispute from a consumer reporting agency, to conduct an investigation of the disputed information, and then modify, delete, or permanently block the reporting of that information as appropriate.

4.     Defendants compile, maintain, and report information concerning Plaintiff's credit-worthiness, credit-standing, credit capacity, character, and general

2

reputation. That information is then made available for use by third-parties in credit transactions involving Plaintiff, for employment purposes, the underwriting of insurance for Plaintiff, and even in connection with a determination of Plaintiff's eligibility for a license or other governmental benefit. Accordingly, and pursuant to various provisions of the FCRA, Plaintiff has a legally protected interest in Defendants fulfilling their respective duties under the FCRA, so that the information reported and maintained by Defendants is done so in a manner which is fair and equitable to Plaintiff, with regards to the confidentiality, accuracy, and relevancy of that information.

5.      This action for damages is based on Defendants' false reporting on Plaintiff's credit files and/or consumer reports, failures to follow reasonable procedures to assure maximum possible accuracy of the information concerning Plaintiff, and failures to conduct reasonable investigations and reinvestigations with respect to disputes of such information.

## **PARTIES**

6.      Plaintiff, Vanessa Annette Owings, is a natural person who resides in Jackson County, Georgia.

7.     Plaintiff is an individual and is, therefore, a "consumer" as that term is defined by 15 U.S.C. § 1681a(c).

8.     Defendant, Equifax Information Services, LLC (hereinafter "Equifax"), is a limited liability company formed under the laws of the State of Georgia. Equifax may be served with process via its registered agent, Lisa Stockard, 1550 Peachtree Street Northwest, Atlanta, Georgia 30309.

9.     Equifax regularly assembles and/or evaluates consumer credit information for the purpose of furnishing consumer reports to third parties and uses interstate commerce to prepare and/or furnish the reports. Accordingly, Equifax is a "consumer reporting agency" as that term is defined by 15 U.S.C. § 1681a(f).

10.     Defendant, Trans Union LLC (hereinafter "TransUnion"), is a limited liability company formed under the laws of the State of Delaware and registered to do business in the State of Georgia. TransUnion may be served with process via its registered agent, Prentice-Hall Corporation System, 40 Technology Parkway South, Suite 300, Norcross, Georgia 30092.

11.     TransUnion regularly assembles and/or evaluates consumer credit information for the purpose of furnishing consumer reports to third parties and uses

interstate commerce to prepare and/or furnish the reports. Accordingly, TransUnion is a "consumer reporting agency" as that term is defined by 15 U.S.C. § 1681a(f).

12.     Defendant, Flagstar Bancorp, Inc. (hereinafter "Flagstar") is a corporation formed under the laws of the State of Michigan. Flagstar may be served with process via its registered agent, CSC-Lawyers Incorporating Service (Company), at 601 Abbot Road, East Lansing, Michigan 48823.

13.     Flagstar regularly and in the ordinary course of business furnishes information to one or more consumer reporting agencies about consumer transactions, such as Plaintiff's transactions at issue in this lawsuit and described herein, and is, therefore, a "furnisher" as that term is used in 15 U.S.C. § 1681s-2.

14.     Defendant, Sterling Jewelers Inc. (Delaware) a/k/a and d/b/a Kay Jewelers (hereinafter "Sterling") is a corporation formed under the laws of the State of Delaware and registered to do business in the State of Georgia. Sterling may be served with process via its registered agent, C T Corporation System, at 289 South Culver Street, Lawrenceville, Georgia 30046.

15.     Sterling regularly and in the ordinary course of business furnishes information to one or more consumer reporting agencies about consumer

transactions, such as Plaintiff's transactions at issue in this lawsuit and described herein, and is, therefore, a "furnisher" as that term is used in 15 U.S.C. § 1681s-2.

## JURISDICTION AND VENUE

16.    This Court has federal question jurisdiction over Plaintiff's Fair Credit Reporting Act ("FCRA"), 15 U.S.C. § 1681, *et seq*., claims pursuant to 15 U.S.C. § 1681p and 28 U.S.C. § 1331.

17.    This Court has personal jurisdiction over Defendants pursuant to O.C.G.A. § 9-10-91(1) because, *inter alia*, Defendants frequently and routinely conduct business in the State of Georgia, including the conduct complained of herein.

18.    Pursuant to 28 U.S.C. § 1391, venue is proper in the Northern District of Georgia because a substantial part of the events or omissions giving rise to the claims occurred in this district.

19.    Pursuant to LR 3.1B(3), venue is proper in the Atlanta Division because one or more Defendants maintain agents for service of process within the Atlanta Division.

## ALLEGATIONS OF FACT

### Plaintiff's Mortgage

20.    On or about November 26, 2012, Plaintiff obtained a residential home loan from Certusbank N.A. for the original principal amount of $82,653.00 (the "Mortgage").

21.    The Mortgage is collateralized by residential real property located at 63 Laura Lane, Commerce, Georgia 30529, as evidenced by the Security Deed recorded at Deed Book 64N, Page 208, in the Superior Court of Jackson County.

22.    On or about July 26, 2018, the Mortgage was transferred from Certusbank N.A. to Lakeview Loan Servicing LLC, as evidenced by the Assignment recorded at Deed Book 81S, Page 77, in the Superior Court of Jackson County.

### Plaintiff's Bankruptcy Case

23.    On January 14, 2019, Plaintiff filed a Chapter 13 Voluntary Bankruptcy Petition in the United States Bankruptcy Court for the Northern District of Georgia, Gainesville Division, Case Number 19-20047 (the "Bankruptcy Case").

24.    In Schedule D of her Bankruptcy Petition, Plaintiff listed Flagstar as a secured creditor with a claim for the Mortgage in the amount of $75,867.00.

25.    In Schedule F of her Bankruptcy Petition, Plaintiff listed Sterling as an unsecured creditor with a claim (the "Debt").

26.    On March 11, 2019, on behalf of Sterling, Atlas Acquisitions LLC filed a Proof of Claim in Plaintiff's Bankruptcy Case, claim number 8, representing it was owed $191.15.

27.    On March 13, 2019, Flagstar filed a Proof of Claim in Plaintiff's Bankruptcy Case, claim number 9, representing it was owed $75,867.00.

28.    On July 11, 2019, Plaintiff filed her Chapter 13 Plan in accordance with 11 U.S.C. § 1322, reforming any pre-existing contract with Sterling and setting forth her proposed treatment of the Debt owed to Sterling, including detailed payment terms, as well as providing for the cure of any then-existing deficiency and the direct payment of all future Mortgage payments by Plaintiff to Flagstar.

29.    As the Mortgage is secured only by a security interest in real property that is Plaintiff's principal residence, Plaintiff's Chapter 13 Plan cannot and will not discharge the Mortgage, and thus left Flagstar's rights otherwise unaffected.

30.    Plaintiff's Plan provided, in part, that Sterling's allowed claim would be paid through the Chapter 13 Trustee and that no payments would be forthcoming from any other source.

31.    Following confirmation, Sterling was bound by the terms of the Plan, including the provisions controlling payment of its claim, in accordance with 11 U.S.C. § 1327(a).

32.    A confirmed plan constitutes a new contract between the debtor and creditors, and thereafter, a creditor's rights are defined by the confirmed plan. Consequently, a pre-petition claim provided for in a confirmed plan is no longer a pre-petition claim. The claim is a right to payment arising from the confirmed plan.

33.    Flagstar did not object to Plaintiff's Plan.

34.    Sterling did not object to Plaintiff's Plan.

35.    On August 8, 2019, Plaintiff's Plan was confirmed.

36.    Flagstar and Sterling were served with a copy of the Order Confirming Plan on August 10, 2019, by the Bankruptcy Noticing Center.

37.    The Bankruptcy Case is currently pending and Plaintiff continues to substantially perform under the terms of her Confirmed Plan.

38.    The Mortgage has not been discharged and is not subject to discharge pursuant to 11 U.S.C. §§ 1322(b)(2) and 1328(a)(1). See, *Dukes v. Suncoast Credit Union* (*In re Dukes*)*,* 909 F.3d 1306 (11th Cir. 2018).

39.     As recently as October 29, 2020, Flagstar advised the Bankruptcy Court and Plaintiff that Plaintiff's Mortgage was being serviced by Flagstar and that Plaintiff's obligation is ongoing.

40.     Accordingly, Plaintiff has continued to make her post-filing Mortgage payments to Flagstar, and Flagstar has continued to service Plaintiff's Mortgage and accept her post-filing Mortgage payments.

### Effect of Consumer Reports Which Contain Inaccurate or Misleading Information

41.     Under the FCRA, the term "consumer report" generally refers to:

> any written, oral, or other communication of any information by a consumer reporting agency bearing on a consumer's credit worthiness, credit standing, credit capacity, character, general reputation, personal characteristics, or mode of living which is used or expected to be used or collected in whole or in part for the purpose of serving as a factor in establishing the consumer's eligibility for:
>
> > i.      credit or insurance to be used primarily for personal, family, or household purposes;
> >
> > ii.     employment purposes; or
> >
> > iii.    any other purpose authorized under section 1681b of this title.

15 U.S.C. § 1681a(d)(1).

10

42.     The information contained in a consumer report bears on a consumer's credit worthiness, credit standing, credit capacity, character, general reputation, and personal characteristics.

43.     The information contained in a consumer report can have a tremendous effect on the consumer; to name only a few, the report can impact the consumer's:

    a.     Eligibility for and terms for credit;

    b.     Potential for refinancing of existing credit;

    c.     Eligibility for leasing prospects;

    d.     Eligibility for utility services;

    e.     Eligibility for and the terms of insurance;

    f.     Employment or potential employment;

    g.     Accounts which are under collection or review;

    h.     Eligibility for a license or other benefit granted by a governmental instrumentality, particularly where the instrumentality is required by law to consider an applicant's financial responsibility or status;

    i.     Standing with potential investors or servicers; and

j.      Eligibility for individually-billed travel charge cards used by executive departments and agencies.

44.    The terms "consumer report", "credit report", and "consumer credit report" are used synonymously herein.

45.    Approximately two million consumer reports are issued by credit bureaus each day. See, Robert B. Avery, Paul S. Calem, and Glenn B. Canner, Federal Reserve Board, Division of Research and Statistics, and Raphael W. Bostic, University of Southern California, *An Overview of Consumer Data and Credit Reporting* (February 2003), p. 48-49, available at https://www.federalreserve.gov/pubs/bulletin/2003/0203lead.pdf, *archived at* https://perma.cc/DCY4-ZS6C (last accessed on September 3, 2018).

46.    In 2012, the Federal Trade Commission conducted a study regarding consumer credit reporting errors and determined that anywhere from 10 to 21 percent of consumers have confirmed errors on their consumer reports. Federal Trade Commission, *Report to Congress under Section 319 of the Fair and Accurate Credit Transactions Act of 2003* (December 2012), p. iv of Executive Summary, available at https://www.ftc.gov/sites/default/files/documents/reports/section-319-fair-and-accurate-credit-transactions-act-2003-fifth-interim-federal-trade-

commission/130211factareport.pdf, *archived at* https://perma.cc/R3P4-FGV9 (last accessed on September 3, 2018).

47.    The FTC study found that not only do these errors adversely affect consumers' credit scores, but the estimated proportion of reports and consumers who experience a positive credit score change resulting from the *correction* of these errors is higher than previous estimates from the credit reporting industry. *Id*.

<u>*Credit Scoring*</u>

48.    The Fair Isaac Corporation credit risk scoring system, commonly referred to as "FICO", is the leading credit scoring system and utilizes data reported by credit reporting agencies. See, https://www.myfico.com/credit-education/credit-scores/ (last accessed on September 3, 2018).

49.    The Fair Isaac Corporation uses the data in consumer reports to calculate consumers' credit scores (also known as credit risk scores). *Id*.

50.    The term "credit score" is a numerical value or a categorization derived from a statistical tool or modeling system used by a person who makes or arranges a loan to predict the likelihood of certain credit behaviors, including default. Consumer Financial Protection Bureau, *Supervision and Examination Manual, Version 2* (October 2012), p. 53, available at

http://files.consumerfinance.gov/f/201210_cfpb_supervision-and-examination-manual-v2.pdf, *archived at* http://perma.cc/JF32-RFAA, (last accessed on September 3, 2018).

51.    FICO scores are calculated from five main categories of credit data in a consumer's credit report. Those categories, and their weighted values, are as follows: payment history accounts for 35% of a consumer's FICO score; debt/amounts owed accounts for 30% of a consumer's FICO score; age/length of credit history accounts for 15% of a consumer's FICO score; new credit/recent inquiries accounts for 10% of a consumer's FICO score; and mix of accounts/types of credit accounts for 10% of a consumer's FICO score. See, https://www.myfico.com/credit-education/whats-in-your-credit-score/, *archived at* https://perma.cc/E8Y3-F4AA (last accessed September 3, 2018).

52.    Payment history is the most important aspect of a consumer's credit score because it shows how the consumer has managed his finances, including any late payments. Credit history is also very important, as it demonstrates how long the consumer has been managing his accounts, when his last payments were made, and any recent charges. See, https://www.transunion.com/credit-score, *archived at* https://perma.cc/NRZ4-W83U (last accessed September 3, 2018).

14

53. The cost of credit (e.g., interest rates, fees, etc.), the availability of credit, ratings for insurance products, and even unsolicited credit offers, such as the opportunity to refinance a mortgage at a lower interest rate, extended financing periods and lower rate auto loans, and even zero-percent financing credit offers for in-store credit lines, are all, by and large, driven by a consumer's credit score.

54. Inaccurate or incorrect credit reporting very often results in a lower FICO and other credit scoring model scores, and thus higher costs of credit, diminished opportunity, and less purchasing power for consumers.

55. "Charge off" is an accounting term, and simply means that the credit grantor wrote the account off of their receivables as a loss, and that the account is closed to future charges. See,

https://www.experian.com/blogs/ask-experian/charged-off-debt-must-still-be-repaid/ (last accessed September 3, 2018).

56. When an account displays a status of "charge off," although the account is closed to future use, the debt is still owed. In fact, most lenders sell their charged off accounts to a collection agency for a percentage of the account's value. *Id*.

57. Incorrectly reporting the tradeline of Plaintiff's Debt—which is provided for by Plaintiff's Confirmed Bankruptcy Plan—as charged off, without

also properly noting that the Debt is included in and subject to Plaintiff's Bankruptcy Case, adversely affects Plaintiff's FICO score, as it negatively misrepresents the Debt owed by Plaintiff.

58.     Incorrectly reporting the tradeline of Plaintiff's Mortgage—which is open, active, and has a balance that Plaintiff is making payments on—with a status of closed and with a blank balance, adversely affects Plaintiff's FICO score, as it excludes any recent positive payment history associated with the Mortgage, it alters the age/length of credit history, and it alters the mix of accounts/types.

59.     There is no established rule or threshold for classifying the significance of a credit score change as minor or major because the impact of a change in score is dependent on the current score. That is, a twenty-five-point change in a credit score that keeps the consumer in a particular credit risk category may not have a large impact on the person's likelihood of receiving credit. However, a one-point change in credit score that moves the consumer from one risk tier to the next may have a large impact on the consumer's access to credit or the products and rates the consumer is able to secure.

60.     Consistent with FTC study, the Fair Isaac Corporation states that inaccurate or incorrect information on a consumer's credit report can hurt their score.

16

See, https://www.myfico.com/credit-education/questions/fix-errors-on-credit-report/, *archived at* https://perma.cc/9TQN-S5WP (last accessed September 3, 2018).

<u>*Credit-Based Insurance Scoring*</u>

61.     Other entities that regularly review consumer reports, and use the data contained therein, are insurance companies.

62.     Insurance companies use a scoring mechanism which is similar to, but distinct from, the "credit score" used by creditors.

63.     Credit-based insurance scores, like credit scores themselves, are numerical summaries of consumers' credit histories; credit-based insurance scores are typically calculated using a multitude of information, including, but not limited to, the length and age of credit history and the use of certain types of credit. Federal Trade Commission, *Credit-Based Insurance Scores: Impacts on Consumers of Automobile Insurance* (July 2007), p. 11, available at

https://www.ftc.gov/sites/default/files/documents/reports/credit-based-insurance-scores-impacts-consumers-automobile-insurance-report-congress-federal-trade/p044804facta_report_credit-based_insurance_scores.pdf, *archived at*

https://perma.cc/B2VQ-452N (last accessed September 3, 2018). As cited in *Ins. Inst. V. Commissioner*, 486 Mich. 370, 785 N.W.2d 67 (2010).

64.     Credit-based insurance scores evolved from traditional credit scores, and all major automobile insurance companies use credit-based insurance scores in some capacity; insurers use these scores to assign consumers to risk pools and to determine the premiums that they pay. *Id*. at 22.

65.     A Wallethub study determined that a change in credit scores caused a consumer's automobile insurance rates to rise by an average of 67% nationwide, and an average of 84% in Georgia. *2018's States Where Credit Scores Affect Car Insurance the Most – Credit Score & Car Insurance Report*, available at https://wallethub.com/edu/car-insurance-by-credit-score-report/4343/, *archived at* https://perma.cc/CSL8-D47Y (last accessed September 3, 2018).

66.     Homeowner's insurance companies also use credit scores to decide whether to issue policies, and on what terms. A higher credit score is taken to mean that a consumer is less of a risk, which, in turn, means the consumer is more likely to be able to obtain insurance, and pay less for it.

See   https://www.consumer.ftc.gov/articles/0152-credit-scores,   *archived   at* https://perma.cc/EB3D-54UP (last accessed September 3, 2018).

67.    The National Association of Insurance Commissioners ("NAIC") is the U.S. standard-setting and regulatory support organization created and governed by the chief insurance regulators from the 50 states, the District of Columbia, and five U.S. territories. See, http://www.naic.org/index_about.htm (last accessed September 3, 2018).

68.    The NAIC advises consumers who find errors on their credit reports to contact the credit reporting company to have the errors corrected, as the errors can affect the consumer's credit-based insurance score. National Association of Insurance Commissioners, *Credit-Based Insurance Scores: How an Insurance Company Can Use Your Credit to Determine Your Premium*, available at http://www.naic.org/documents/consumer_alert_credit_based_insurance_scores.htm, *archived at* https://perma.cc/S4F2-9VTL (last accessed September 3, 2018).

69.    There are several different companies that create credit-based insurance score reports for insurers to use, including the Fair Isaac Corporation. In calculating credit-based insurance scores, FICO looks at five general areas it believes will best determine how an individual manage risks. *Id*.

70.    The following is a breakdown of what FICO considers in calculating credit-based insurance scores, and how much the information generally weighs in

19

that calculation: payment history accounts for 40% of a consumer's of a consumer's FICO credit-based insurance score; debt/amounts owed accounts for 30% of a consumer's of a consumer's FICO credit-based insurance score; age/length of credit history accounts for 15% of a consumer's FICO credit-based insurance score; new credit/recent inquiries accounts for 10% of a consumer's of a consumer's FICO credit-based insurance score; and, mix of accounts/types of credit accounts for 5% of a consumer's of a consumer's FICO credit-based insurance score. *Id*.

71.     Incorrectly reporting the tradeline of Plaintiff's Debt—which is provided for by Plaintiff's Confirmed Bankruptcy Plan—as charged off, without also properly noting that the Debt is included in and subject to Plaintiff's Bankruptcy Case, adversely affects Plaintiff's FICO credit-based insurance score, as it negatively misrepresents the debt/amounts owed by Plaintiff.

72.     Incorrectly reporting the tradeline of Plaintiff's Mortgage—which is open, active, and has a balance that Plaintiff is making payments on—with a status of closed and with a blank balance, adversely affects Plaintiff's FICO credit-based insurance score, as it excludes any recent positive payment history associated with the Mortgage, it alters the age/length of credit history, and it alters the mix of accounts/types.

## The CDIA Metro 2 Credit Reporting Standards

### *The CDIA has Imposed Rigorous Industry Standards to Ensure FCRA Compliance*

73.     The reporting of consumer credit information, by credit reporting agencies ("CRAs") and data furnishers, is the foundation of credit risk scoring and impacts the financial lives of consumers in innumerable ways, including the availability and cost of credit, housing opportunities, leasing prospects, insurance availability and cost, utility service, and even employment. Between two and three million consumer reports are issued by credit bureaus each day. See, http://www.cdiaonline.org/about.cfm (last accessed September 3, 2018).

74.     The Consumer Data Industry Association ("CDIA") is an international trade association, representing over 140 members involved in credit reporting, mortgage reporting, check verification, tenant and employment screening, collection services, and fraud verification services, and the CDIA is active in both federal and state legislative affairs, public relations, education, and the promulgation of industry standards.

75.     Because consumer credit reporting information is such sensitive data that has far reaching implications for most, if not all, consumers, the CDIA works

together with CRAs to develop, maintain and enhance industry-standard reporting formats and guidelines.

76.    To further assist CRAs and data furnishers with performing their due diligence and reporting accurate, complete, and timely data, in satisfaction of the FCRA's legal requirements, the CDIA offers extensive training, education, and support to CRAs and data furnishers.

77.    The CDIA's extensive training and support offerings include FCRA certification programs for both CRAs and data furnishers, to assist each in maintaining compliance with FCRA regulations.

78.    Because standardized methods are of paramount importance to the accurate, complete and timely reporting of consumer credit data, the CDIA can and will revoke FCRA certification for failure to adhere to the standards set by the CDIA.

79.    In cooperation with the major CRAs, CDIA publishes the Metro 2 ("Metro 2") reporting standards to assist furnishers with their compliance requirements under the FCRA. CDIA's reporting products are used in more than nine billion transactions each year.

See,      http://www.cdiaonline.org/about/index.cfm?unItemNumber=515      (last accessed September 3, 2018).

80.    The Metro 2 Format Task Force is comprised of representatives from Equifax, Experian, Innovis, and TransUnion, and is supported by the CDIA. Metro 2 Format Task Force's mission is to provide a standardized method for the reporting of accurate, complete and timely data, and has developed the Metro 2 standards. *Id.*

81.    In order to ensure compliance with the FCRA, and in furtherance of its mission, the Metro 2 Format Task Force has developed an industry standard (the "Metro2 standard") for reporting consumer accounts that "will ensure the integrity and consistency of the credit information being reported."

82.    In the credit reporting industry, Metro 2 is widely known as the well-established industry standard, uniformly adopted by furnishers and CRAs alike.

83.    As such, viewers/users of consumer reports both expect and rely on the information contained in consumer reports to be reported in compliance with the Metro 2 standards.

84.    A deviation from the Metro 2 standards results in a reported item being incomplete and/or misleading to viewers/users of consumer reports.

85.    In fact, the existence of an "industry standard" itself—one which is uniformly adopted and contractually enforced—compounds errors because it gives more credibility to false reporting.

23

86.   Without the existence of Metro 2, a viewer/user of consumer reports *might* presume that the furnisher or CRA simply made a mistake with respect to erroneous, negative credit reporting.

87.   However, since viewers/users of consumer reports know that Metro 2 has layers of rules and checks to ensure accuracy, they are more likely to "blame" the consumer for the false, negative credit reporting.

88.   Thus, a deviation from the Metro 2 standards results in adverse consequences for the consumer.

89.   15 U.S.C. § 1681e(b) requires consumer reporting agencies to follow reasonable procedures to assure maximum possible accuracy of information concerning the individual about whom a report relates. Similarly, 15 U.S.C. § 1681i(a)(1) requires consumer reporting agencies to conduct reasonable reinvestigations of a consumer's dispute of the completeness or accuracy of any item of information contained in the consumer's file.

90.   15 U.S.C. § 1681s-2(a)(2) requires furnishers of information to regularly correct and update the information they previously provided to consumer reporting agencies, to make sure the information is complete and accurate. Similarly, upon receiving notice from a consumer reporting agency of a consumer's dispute,

15 U.S.C. § 1681s-2(b)(1) requires furnishers of information to conduct reasonable investigations of a consumer's dispute of the completeness or accuracy of any information provided by the furnisher of information to a consumer reporting agency.

91.    The uniform adoption and implementation of the Metro 2 standards is the primary vehicle by which CRAs and furnishers ensure that they are in compliance with their respective duties to ensure that they maintain complete and accurate information under the FCRA.

92.    The Metro 2 standards provide uniformity in the reporting and interpretation of credit data, including credit risk scoring.

93.    The Metro 2 standards are documented in the Credit Reporting Resource Guide ("CRRG"), an industry-standard publication produced and distributed by the CDIA.

94.    As an integral aspect of its duties under the FCRA, Equifax is required to have in place adequate and reasonable policies and procedures to assure the maximum possible accuracy of information concerning individuals about whom Equifax produces reports; the requirement to maintain reasonable procedures extends to Equifax's handling and reinvestigation of disputed information.

25

95.   At all times relevant hereto, Equifax adopted and implemented the Metro 2 format as a means of fulfilling its aforementioned duties under the FCRA.

96.   At all times relevant hereto, Equifax has required all entities to whom it grants consumer information reporting rights and access to adhere to the Metro 2 reporting guidelines as a condition of such ability and access.

97.   As an integral aspect of its duties under the FCRA, TransUnion is required to have in place adequate and reasonable policies and procedures to assure the maximum possible accuracy of information concerning individuals about whom TransUnion produces reports; the requirement to maintain reasonable procedures extends to TransUnion's handling and reinvestigation of disputed information.

98.   At all times relevant hereto, TransUnion adopted and implemented the Metro 2 format as a means of fulfilling its aforementioned duties under the FCRA.

99.   At all times relevant hereto, TransUnion has required all entities to whom it grants consumer information reporting rights and access to adhere to the Metro 2 reporting guidelines as a condition of such ability and access.

100.   As an integral aspect of its duties under the FCRA, Flagstar is required to have in place adequate and reasonable policies and procedures for handling and investigation of disputed information.

101.   At all times relevant hereto, Flagstar adopted and implemented the Metro 2 format as a means of fulfilling its aforementioned duties under the FCRA.

102.   Furthermore, at all times relevant hereto, Flagstar incorporated, warranted, and or represented to all CRAs to which it reported that it had adopted and implemented the Metro 2 format for its reporting of consumer data, and would otherwise comply with Metro 2 and CDIA guidelines in its reporting of consumer information.

103.   As an integral aspect of its duties under the FCRA, Sterling is required to have in place adequate and reasonable policies and procedures for handling and investigation of disputed information.

104.   At all times relevant hereto, Sterling adopted and implemented the Metro 2 format as a means of fulfilling its aforementioned duties under the FCRA.

105.   Furthermore, at all times relevant hereto, Sterling incorporated, warranted, and or represented to all CRAs to which it reported that it had adopted and implemented the Metro 2 format for its reporting of consumer data, and would otherwise comply with Metro 2 and CDIA guidelines in its reporting of consumer information.

*The National CRAs and the Furnishers of Consumer Information Communicate
Metro 2 Compliant Notices of Consumer Disputes and Responses,
Respectively, Through the e-Oscar Reporting Platform*

106.   The FCRA requires CRAs to implement an automated reinvestigation system through which furnishers of information to the CRA may report the results of a reinvestigation that finds incomplete or inaccurate information in a consumer's file. 15 U.S.C. § 1681i(a)(5)(D).

107.   To comply with the automated dispute reinvestigation requirements of the FCRA, Trans Union, Equifax, and Experian (the three major "National CRAs"), along with Innovis Data Solutions, Inc., developed and implemented a browser-based software system that allows the CRAs to electronically notify furnishers quickly and easily of disputed credit reporting information, and for furnishers to quickly and easily respond to such disputes following the furnisher's investigation of the disputed information.

108.   The system is commonly referred to as e-OSCAR (Online Solution for Complete and Accurate Reporting) and was designed to be Metro 2 compliant. See *http://www.e-oscar.org/* (last accessed October 30, 2018).

109.   The e-OSCAR system primarily supports Automated Credit Dispute Verification ("ACDV") and Automated Universal Data Form ("AUD") processing, as well as other consumer-dispute-related processes. *Id*.

110.   The National CRAs, provide notice of a consumer's dispute to data furnishers in the ACDV format, and forward the ACDV to the furnisher through e-OSCAR.

111.   If a furnisher's investigation of a consumer's dispute determines that the information in dispute is incomplete or inaccurate, the FCRA requires the furnisher to correct the information not only with the CRA that sent the ACDV, but with all other CRAs to whom the furnisher reported that information. 15 U.S.C. § 1681s-2(b)(1)(D).

112.   The e-OSCAR system facilitates the furnisher's compliance with 15 U.S.C. § 1681s-2(b)(1)(D) by sending a "Carbon Copy" of an ACDV response "to each CRA with whom the [furnisher] has a reporting relationship" in addition to the response to the initiating CRA. See *https://www.e-oscar.org/implementation/about-us* (last accessed February 19, 2019).

113.   Additionally, a furnisher can manually correct a tradeline with a CRA other than the one that initiated a dispute by sending an AUD within e-OSCAR.

29

114.   Equifax and TransUnion require data furnishers that report to Equifax and TransUnion to register with and use e-OSCAR, and states that e-OSCAR is "in compliance with FCRA and Metro 2 standards." See, *https://www.transunion.com/data-reporting/support-teams* (last accessed October 30, 2018).

*Viewers of Credit Reports Presume Compliance with the Metro 2 Standards; Departures from the Standards are, Therefore, Inherently Misleading*

115.   The CRRG and the Metro 2 guidelines have been uniformly adopted across the credit reporting industry.

116.   All entities which contribute to consumer reports have agreed to comply with the Metro 2 guidelines, which are "accepted by all consumer reporting agencies;" likewise, consumer reporting agencies require their furnishers to comply with the Metro2 guidelines as a condition of their agreements. CRRG at 2-1.

117.   Given the universal adoption of Metro 2, a creditor or other entity performing risk scoring or other functions using the data provided in a consumer report will view the report in the light of the guidelines, presuming that the information reported is in compliance with industry standards.

118.   For example, The FICO scoring system utilizes data reported by CRAs and furnishers which are, ostensibly, in compliance with Metro 2 standards.

30

119.   As Metro 2 format has been adopted as the credit reporting industry standard, the failure on the part of a CRA to adhere to the accepted Metro 2 standards increases the probability of a reported item being false or materially misleading to viewers of consumer reports, as those users reasonably presume that the information in the consumer reports is being reported in compliance with Metro 2 standards, and interpret that information accordingly.

120.   Thus, failure to adhere to Metro 2 in consumer credit reporting adversely affects consumers, as it causes inconsistent, misleading, and/or incorrect interpretation of information regarding consumers.

121.   Equifax and TransUnion have actual knowledge that entities reviewing consumer credit reports presume that Equifax and TransUnion have complied with the Metro 2 standards.

122.   Flagstar and Sterling have actual knowledge that entities reviewing consumer credit reports presume that Flagstar and Sterling has complied with the Metro 2 standards.

123.   Because users of consumer credit reports presume the information in those reports complies with the Metro 2 standards, the failure on the part of a CRA and/or a furnisher to adhere to the accepted Metro 2 standards increases the

31

probability of a reported item being false or materially misleading to users of consumer reports, and thus adversely affecting the consumer.

124.   The failure on the part of a CRA and/or a furnisher to adhere to the accepted Metro 2 standards can itself support a finding of willful violation as described by 15 U.S.C. § 1681n when that failure results in a report that is false, incomplete, and misleading.

125.   Further, the failure to adhere to the Metro 2 format, and/or the failure to follow the guidance of regulatory and industry sources, such as the CDIA, is evidence of willfulness of an FCRA violation under 15 U.S.C. § 1681n(a). *See*, *Gillespie v. Equifax Info. Servs., LLC*, No. 05C138, 2008 WL 4316950, at *8 (N.D. Ill. Sept. 15, 2008).

*The Metro 2 Guidelines Mandate Regular Monthly Reporting of All Accounts*

126.   As part of that industry standard, the Metro 2 Format Task Force has declared, "All accounts must be reported *on a monthly basis*." [Emphasis added] CRRG at 2-2.

127.   Because consumer credit information changes monthly, failure to update that information on a monthly basis, yet still publishing reports containing

the previously reported information without updates, means that the information being reported is almost certainly incomplete, inaccurate, and misleading.

*The Significance of the Consumer Information Indicator*

128.   Of particular importance in reporting under the Metro2 standards is the Consumer Information Indicator ("CII"), a single-character code which indicates an account's status in relation to a consumer's bankruptcy.

129.   Furnishers and CRAs are required to update the CII code when a petition for bankruptcy is filed, and again when the bankruptcy is discharged, dismissed, or withdrawn.

130.   The reporting of a proper CII code for a consumer's account ensures that the tradeline for that account accurately discloses that account's relationship to the bankruptcy case, and can suppress other statements about the account (i.e., "in collections", "charged off") which are inconsistent with its status with respect to the bankruptcy.

131.   While furnishers sometimes report derogatory information about an account during and after a bankruptcy, the reporting of an accurate CII code ensures that if such derogatory information is reported, it is either withheld from viewers of the report, or placed in its proper context relative to the consumer's bankruptcy.

132.   This is especially important, as not all accounts are included in and/or dischargeable by consumer bankruptcy.

133.   The failure to report an accurate CII code for an account which was discharged in bankruptcy, or is included in an active bankruptcy, can lead to a consumer's report containing derogatory information which would otherwise not be visible to viewers of the report, and render other portions of the report misleading, since a viewer would not be aware that the account is included in bankruptcy.

134.   Similarly, where an account which *is not* discharged or dischargeable in bankruptcy is reported with an incorrect CII indicator, the consumer's report can falsely indicate that the account is subject to bankruptcy or discharge, and suppress the consumer's positive history of making payments toward the account.

135.   These false impressions become even greater in the light of the universally adopted Metro 2 standards, which require that an account within, or discharged by, a consumer bankruptcy be identified as such.

136.   Since the broadly adopted industry standard requires disclosure of a pending bankruptcy, the absence of such a disclosure inherently misleads a viewer into believing that the account is not included in bankruptcy.

*Reporting of Accounts with an Active, Confirmed*
*Chapter 13 Bankruptcy, under Metro 2*

137.   Upon confirmation of a Chapter 13 plan, Metro 2 requires furnishers and CRAs to report an account included in the debtor's bankruptcy as follows:

a.   A **Consumer Information Indicator** ("CII") of "D" (or blank to maintain a "D" which was previously reported), indicating that the account is subject to a petition for Chapter 13 bankruptcy;

b.   An **Account Status Code** reflecting the status at time of the petition;

c.   A **Payment History** of "D" (indicating "no history available") for each month since the filing of the bankruptcy, plus actual history for prior months;

d.   An **Amount Past Due** of zero;

e.   A **Current Balance** reflecting the current balance as provided for under the terms of the Chapter 13 plan, rather than the original contract;

f.   **Terms Duration & Terms Frequency** which incorporate any changes the contract terms provided for under the Chapter 13 plan;

35

g.     The **Scheduled Monthly Payment Amount** reflecting the scheduled payment amount under the Chapter 13 plan, rather than under the original contract; and

h.     A **Date of Account** Information of the current month's date (increasing with each month's reporting).

CRRG, FAQ 28(a)-(b), at 6-21 to 6-24.

### **Plaintiff's Equifax Consumer Report**

138.   On or about February 19, 2020, Plaintiff obtained a copy of her consumer report as published by Equifax.

139.   That report contained erroneous information as provided by Flagstar and Sterling, and as published and reported by Equifax.

140.   The relevant portion of the Flagstar tradeline appeared in the February 19, 2020 Equifax report as follows:

**3.1 FLAGSTAR BANK (CLOSED)**

**Summary**

Your debt-to-credit ratio represents the amount of credit you're using and generally makes up a percentage of your credit score. It's calculated by dividing an account's reported balance by its credit limit.

| Account Number | xxxxxxxx 5453 | Reported Balance | |
|---|---|---|---|
| Account Status | INCLUDED_IN_CHAPTER_13 | Debt-to-Credit Ratio | N/A |
| Available Credit | | | |

| | | | |
|---|---|---|---|
| High Credit | | Owner | INDIVIDUAL |
| Credit Limit | | Account Type | MORTGAGE |
| Terms Frequency | MONTHLY | Term Duration | 0 |
| Balance | | Date Opened | Nov 26, 2012 |
| Amount Past Due | | Date Reported | Feb 03, 2020 |
| Actual Payment Amount | | Date of Last Payment | Jan 01, 2020 |
| Date of Last Activity | | Scheduled Payment Amount | |
| Months Reviewed | 80 | Delinquency First Reported | Jan 01, 2019 |
| Activity Designator | | Creditor Classification | UNKNOWN |
| Deferred Payment Start Date | | Charge Off Amount | |
| Balloon Payment Date | | Balloon Payment Amount | |
| Loan Type | US Department of Agriculture Real Estate Mortgage Loan | Date Closed | |
| Date of First Delinquency | Jan 01, 2019 | | |
| **Comments** | | **Contact** | |
| Bankruptcy chapter 13 | | FLAGSTAR BANK | |
| | | 5151 CORPORATE DRIVE | |

(Remaining portion of tradeline omitted.)

141. Because the Mortgage has not been discharged in Plaintiff's Bankruptcy Case (as the Bankruptcy Case has not been discharged at all) and the Mortgage is not subject to discharge, and Plaintiff continues to make payments to Flagstar on the Mortgage, the information described above was both false and misleading in a number of key respects (the "Inaccurate Reporting"), including, *inter alia*:

    a.    The Mortgage's balance is not reported, rather than the actual current balance of the account (which, in conjunction with the notation of bankruptcy, creates the false impression that the account was discharged in bankruptcy); and

    b.    The account is falsely identified as having been "closed"; and

37

       c.      The tradeline was not reported in compliance with CDIA / Metro 2 standards.

142.   The Inaccurate Reporting was in derogation of accepted industry standards for reporting the Mortgage as set forth by the CDIA and Metro 2 and as adopted by Defendants, including, *inter alia*:

       a.      The Balance is not reported, rather than the current balance as provided for under the Chapter 13 plan, as required by Metro 2; and

       b.      The Scheduled Monthly Payment is not reported, rather than the monthly payment provided for under the Plan, as required by Metro 2.

143.   The relevant portion of the Sterling tradeline appeared in the February 19, 2020 Equifax report as follows:

**2.4 KAY JEWELERS (CLOSED)**

**Summary**

Your debt-to-credit ratio represents the amount of credit you're using and generally makes up a percentage of your credit score. It's calculated by dividing an account's reported balance by its credit limit.

| Account Number | | Reported Balance | $0 |
|---|---|---|---|
| Account Status | CHARGE_OFF | Debt-to-Credit Ratio | 0% |
| Available Credit | $191 | | |

| | | | |
|---|---|---|---|
| High Credit | | Owner | INDIVIDUAL |
| Credit Limit | $191 | Account Type | REVOLVING |
| Terms Frequency | MONTHLY | Term Duration | 0 |
| Balance | $0 | Date Opened | Feb 04, 2016 |
| Amount Past Due | | Date Reported | Sep 10, 2017 |
| Actual Payment Amount | | Date of Last Payment | Mar 01, 2016 |
| Date of Last Activity | | Scheduled Payment Amount | |
| | | | |
| Months Reviewed | 19 | Delinquency First Reported | Aug 01, 2017 |
| Activity Designator | TRANSFER_OR_SOLD | Creditor Classification | UNKNOWN |
| Deferred Payment Start Date | | Charge Off Amount | $191 |
| Balloon Payment Date | | Balloon Payment Amount | |
| Loan Type | Charge Account | Date Closed | |
| Date of First Delinquency | Jan 01, 2017 | | |
| **Comments** | | **Contact** | |
| Charged off account | | KAY JEWELERS | |
| | | 375 GHENT RD | |

(Remaining portion of tradeline omitted.)

144.   Because the Debt is included in Plaintiff's Bankruptcy Case and provided for in the Confirmed Plan, the information described above was both false and misleading in a number of key respects (the "Inaccurate Reporting"), including, *inter alia*:

a.    The Debt's current status is reported as "Charge Off" rather than as "Included in Bankruptcy"; and

b.    The tradeline does not disclose the fact of Plaintiff's Bankruptcy Case or that the Debt is included in and subject to the Bankruptcy Case; and

c.    The tradeline was not reported in compliance with CDIA / Metro 2 standards.

39

145.   The Inaccurate Reporting was in derogation of accepted industry standards for reporting the account as set forth by the CDIA and Metro 2 and as adopted by Defendants, including, *inter alia*:

      a.    The tradeline does not disclose the fact of Plaintiff's Bankruptcy Case, or the fact that the Debt is included in and subject to the Bankruptcy Case, and instead lists a status of "Charge Off", which indicates that the furnisher did not report a CII of "D" as required by Metro 2.

146.   In a letter dated June 9, 2020, Plaintiff disputed the inaccurate and misleading information directly to Equifax and advised Equifax that her account with Sterling was included in her active Bankruptcy Case and her mortgage with Flagstar was not closed and did not have a balance of $0.00. The relevant portion of Plaintiff's dispute is reproduced below:

My account with Kay Jewelers, 375 Ghent Rd, Akron, Ohio 44333; Fingerhut/Webbank, 6250 Ridgewood Rd, St Cloud, Minnesota 56303; and Ginny's Inc - CPU, 1112 7th Av, Monroe, Wisconsin 5566 are included in my active bankruptcy case filed on January 14, 2019, case number 19-20047. I am including the notice documents from the court for your review. The "status" for the accounts should be corrected to reflect their inclusion in that case. Please contact these agencies to verify this information and correct these entries.

Additionally, my mortgage with Flagstar Bank, 5151 Corporate Dr, Troy, Michigan 48098, account number *********5453, is reporting incorrectly. My mortgage is included in my bankruptcy (case number 19-20047, filed January 14, 2019) and is provided for by my bankruptcy plan, but it is a long-term debt that is not subject to discharge. Further, my mortgage cannot have been discharged, as my bankruptcy is ongoing, and thus none of my debts have been discharged.

I am disputing the following incorrect information that is being reported in the tradeline for my mortgage with Flagstar Bank: my mortgage is not closed and the balance is not $0.00. I am including copies of documents filed in my bankruptcy that show that the account is not closed. Please contact Flagstar Bank to confirm this information and update this tradeline. Please forward the enclosed documents to assist Flagstar Bank with its review.

147.    The dispute letter provided Defendants with sufficient information to identify and correct the inaccurate reporting.

148.    In support of Plaintiff's dispute, and to assist Defendants' respective investigations, Plaintiff included with her dispute the following documents: a copy of the Meeting of Creditors; a copy of Plaintiff's Chapter 13 Plan showing the Mortgage as long-term debt and thus exempt from discharge under 11 U.S.C. § 1328(a)(1); a copy of the Order Confirming Plaintiff's Chapter 13 Plan; and a copy of the Proof of Claim filed by Flagstar.

41

149.   Equifax failed to provide Plaintiff with a timely response to her June 9, 2020 dispute letter.

150.   One or about August 3, 2020, Plaintiff resubmitted her dispute to Equifax with tracking number 9171 9690 0935 0249 4972 17.

151.   Plaintiff's dispute resubmission was delivered to Equifax on August 7, 2020.

152.   Pursuant to 15 U.S.C. § 1681i, Equifax had a duty to notify Flagstar and Sterling of Plaintiff's dispute within five business days of receiving the dispute, to forward the supporting documents submitted with Plaintiff's dispute for Flagstar and Sterlings's respective reviews, to conduct a reasonable reinvestigation of the disputed information, and to correct the tradeline or delete it from Plaintiff's consumer file.

153.   Upon information and belief, Equifax timely notified Flagstar of Plaintiff's dispute, via e-OSCAR or otherwise, and provided the supporting documents submitted with Plaintiff's dispute.

154.   Upon information and belief, Equifax timely notified Sterling of Plaintiff's dispute, via e-OSCAR or otherwise, and provided the supporting documents submitted with Plaintiff's dispute.

42

155.   Alternatively, Equifax failed to notify Flagstar of Plaintiff's dispute, and/or failed to provide the supporting documents submitted with Plaintiff's dispute.

156.   Alternatively, Equifax failed to notify Sterling of Plaintiff's dispute, and/or failed to provide the supporting documents submitted with Plaintiff's dispute.

157.   Upon information and belief, Flagstar received timely notice of Plaintiff's dispute from Equifax.

158.   Upon information and belief, Sterling received timely notice of Plaintiff's dispute from Equifax.

159.   Pursuant to 15 U.S.C. § 1681s-2(b), Flagstar and Sterling had a duty to conduct an investigation with respect to the disputed information, and to modify or delete that information appropriately.

160.   Equifax again failed to provide Plaintiff with a response to her dispute.

161.   On or around November 10, 2020, instead of resubmitting her dispute to Equifax again, Plaintiff obtained a copy of her consumer credit report as published by Equifax.

162.   Despite Plaintiff's multiple submissions of her dispute, her Equifax consumer report continued to publish the erroneous information as provided by Flagstar and Sterling that Plaintiff had originally disputed to Equifax.

163.   Specifically, the Flagstar tradeline appeared in the November 10, 2020

Equifax consumer report as follows:

## 3.1 FLAGSTAR BANK (CLOSED)

### Summary

Your debt-to-credit ratio represents the amount of credit you're using and generally makes up a percentage of your credit score. It's calculated by dividing an account's reported balance by its credit limit.

| | |
|---|---|
| Account Number | xxxxxxxxx 5453 |
| Account Status | INCLUDED_IN_CHAPTER_13 |
| Available Credit | |
| Reported Balance | |
| Debt-to-Credit Ratio | N/A |
| High Credit | |
| Owner | INDIVIDUAL |
| Credit Limit | |
| Account Type | MORTGAGE |
| Terms Frequency | MONTHLY |
| Term Duration | 0 |
| Balance | |
| Date Opened | 11/26/2012 |
| Amount Past Due | |
| Date Reported | 11/06/2020 |
| Actual Payment Amount | |
| Date of Last Payment | 11/01/2020 |
| Date of Last Activity | |
| Scheduled Payment Amount | |
| Months Reviewed | 86 |
| Delinquency First Reported | 01/01/2019 |
| Activity Designator | |
| Creditor Classification | UNKNOWN |
| Deferred Payment Start Date | |

| | |
|---|---|
| Charge Off Amount | |
| Balloon Payment Date | |
| Balloon Payment Amount | |
| Loan Type | US Department of Agriculture Real Estate Mortgage Loan |
| Date Closed | |
| Date of First Delinquency | 01/01/2019 |

**Comments**
Bankruptcy chapter 13
Bankruptcy petition
Loan modified
**Contact**
FLAGSTAR BANK

164.   Specifically, the Sterling tradeline appeared in the November 10, 2020

Equifax consumer report as follows:

## 2.3 KAY JEWELERS (CLOSED)

### Summary

Your debt-to-credit ratio represents the amount of credit you're using and generally makes up a percentage of your credit score. It's calculated by dividing an account's reported balance by its credit limit.

| | |
|---|---|
| Account Number | |
| Account Status | CHARGE_OFF |
| Available Credit | $191.00 |
| Reported Balance | $0.00 |
| Debt-to-Credit Ratio | 0% |

| | |
|---|---|
| High Credit | |
| Owner | INDIVIDUAL |
| Credit Limit | $191.00 |
| Account Type | REVOLVING |
| Terms Frequency | MONTHLY |
| Term Duration | 0 |
| Balance | $0.00 |
| Date Opened | 02/04/2016 |
| Amount Past Due | |
| Date Reported | 09/08/2020 |
| Actual Payment Amount | |
| Date of Last Payment | 03/01/2016 |
| Date of Last Activity | |
| Scheduled Payment Amount | |
| Months Reviewed | 19 |
| Delinquency First Reported | 08/01/2017 |
| Activity Designator | TRANSFER_OR_SOLD |
| Creditor Classification | UNKNOWN |
| Deferred Payment Start Date | |
| Charge Off Amount | |
| Balloon Payment Date | |
| Balloon Payment Amount | |
| Loan Type | Charge Account |

**Comments**
Charged off account
**Contact**
KAY JEWELERS

165.   Equifax either conducted reinvestigation reports on the above-mentioned disputes or it did not.

166.   Plaintiff is not aware of receipt of any reinvestigation report from Equifax.

46

167.   Plaintiff's new disclosure, obtained after the deadline provided by the FCRA, repeats the errors Plaintiff originally disputed.

168.   Had a proper reinvestigation among Equifax, Flagstar, and Sterling occurred, Plaintiff would have either received a reinvestigation report, or the updated disclosure – pulled several months after the deadline required by the FCRA to conduct a reinvestigation – should have reflected the necessary changes to the tradeline.

169.   Neither event in the above paragraph occurred.

170.   Without access to the reinvestigation report, Plaintiff is unable to determine whether any such report has been issued after several requests.

171.   Defendants' post-investigation reporting is, assuming it was conducted, independently and jointly, false and misleading.

172.   Defendants' post-investigation reporting is, assuming it was conducted, in derogation of the Metro 2 reporting standards, and that departure and failure to adhere to the adopted guidelines renders the reporting both false and materially misleading, as users of consumer reports assume Defendants' compliance with Metro 2 standards in reporting consumer information.

173.   If no post-investigation reporting was conducted, Equifax has violated the FCRA multiple times.

**Plaintiff's TransUnion Consumer Report**

174.   On or about February 19, 2020, Plaintiff obtained a copy of her consumer report as published by TransUnion.

175.   That report contained erroneous information as provided by Flagstar, and as published and reported by TransUnion.

176.   The relevant portion of the Flagstar tradeline appeared in the February 19, 2020 TransUnion report as follows:

**FLAGSTAR BK #646050372\*\*\*\***
5151 CORPORATE DR
TROY, MI 48098-2639
(800) 968-7700

| Date Opened: | 11/26/2012 | Balance: | | Pay Status: | >Account Included In |
|---|---|---|---|---|---|
| Responsibility: | Individual Account | Date Updated: | 02/03/2020 | | Bankruptcy< |
| Account Type: | Mortgage Account | Last Payment Made: | 01/06/2020 | Date Closed: | 09/03/2019 |
| Loan Type: | FMHA REAL | High Balance: | $82,653 | | |
| | ESTATE | | | | |
| | MORTGAGE | | | | |

Remarks: CHAPTER 13 BANKRUPTCY; LOAN MODIFIED NON GOVT
Estimated month and year that this item will be removed: 11/2025

(Remaining portion of tradeline omitted.)

177. Because the Mortgage has not been discharged in Plaintiff's Bankruptcy Case (as the Bankruptcy Case has not been discharged at all) and the Mortgage is not subject to discharge, and Plaintiff continues to make payments to Flagstar on the Mortgage, the information described above was both false and

48

misleading in a number of key respects (the "Inaccurate Reporting"), including, *inter alia*:

    a.    The Mortgage's balance is not reported, rather than the actual current balance of the account (which, in conjunction with the notation of bankruptcy, creates the false impression that the account was discharged in bankruptcy); and

    b.    The account is falsely identified as having been "Closed as of September 3, 2019"; and

    c.    The tradeline was not reported in compliance with CDIA / Metro 2 standards.

178.    The Inaccurate Reporting was in derogation of accepted industry standards for reporting the Mortgage as set forth by the CDIA and Metro 2 and as adopted by Defendants, including, *inter alia*:

    a.    The Balance is not reported, rather than the current balance as provided for under the Chapter 13 plan, as required by Metro 2; and

b.    The Scheduled Monthly Payment is not reported, rather than the monthly payment provided for under the Plan, as required by Metro 2.

179.   In a letter dated June 9, 2020, Plaintiff disputed the inaccurate and misleading information directly to TransUnion and advised TransUnion that her mortgage was not closed and did not have a balance of $0.00. The relevant portion of Plaintiff's dispute is reproduced below:

Additionally, my mortgage with Flagstar BK, 5151 Corporate Dr, Troy, Michigan 48098, account number 646050372****, is reporting incorrectly. My mortgage is included in my bankruptcy (case number 19-20047, filed January 14, 2019) and is provided for by my bankruptcy plan, but it is a long-term debt that is not subject to discharge. Further, my mortgage cannot have been discharged, as my bankruptcy is ongoing, and thus none of my debts have been discharged.
I am disputing the following incorrect information that is being reported in the tradeline for my mortgage with Flagstar BK: my mortgage is not closed and the balance is not $0.00. I am including copies of documents filed in my bankruptcy that show that the account is not closed. Please contact Flagstar BK to confirm this information and update this tradeline. Please forward the enclosed documents to assist Flagstar BK with its review.

180.   The dispute letter provided Defendants with sufficient information to identify and correct the inaccurate reporting.

181.   In support of Plaintiff's dispute, and to assist Defendants' respective investigations, Plaintiff included with her dispute the following documents: a copy of the Meeting of Creditors; a copy of Plaintiff's Chapter 13 Plan showing the

Mortgage as long-term debt and thus exempt from discharge under 11 U.S.C. § 1328(a)(1); a copy of the Order Confirming Plaintiff's Chapter 13 Plan; and a copy of the Proof of Claim filed by Flagstar.

182.   TransUnion failed to provide Plaintiff with a timely response to her June 9, 2020 dispute letter.

183.   On or about November August 3, 2020, Plaintiff resubmitted her dispute to TransUnion with tracking number 9171 9690 0935 0249 4972 24.

184.   Plaintiff's resubmission of her dispute was delivered to TransUnion on August 7, 2020.

185.   Again, TransUnion failed to provide Plaintiff with a timely response to her resubmitted dispute.

186.   Pursuant to 15 U.S.C. § 1681i, TransUnion had a duty to notify Flagstar of Plaintiff's dispute within five business days of receiving the dispute, to forward the supporting documents submitted with Plaintiff's dispute for Flagstar's review, to conduct a reasonable reinvestigation of the disputed information, and to correct the tradeline or delete it from Plaintiff's consumer file.

187.   Upon information and belief, TransUnion timely notified Flagstar of Plaintiff's dispute, via e-OSCAR or otherwise, and provided the supporting documents submitted with Plaintiff's dispute.

188.   Alternatively, TransUnion failed to notify Flagstar of Plaintiff's dispute, and/or failed to provide the supporting documents submitted with Plaintiff's dispute.

189.   Upon information and belief, Flagstar received timely notice of Plaintiff's dispute from TransUnion.

190.   Pursuant to 15 U.S.C. § 1681s-2(b), Flagstar had a duty to conduct an investigation with respect to the disputed information, and to modify or delete that information appropriately.

191.   TransUnion again failed to provide Plaintiff with a response to her dispute.

192.   On or around November 10, 2020, instead of resubmitting her dispute to TransUnion again, Plaintiff obtained a copy of her consumer credit report as published by TransUnion.

193.   Despite Plaintiff's multiple submissions of her dispute, her TransUnion consumer report continued to publish the erroneous information as provided by Flagstar that Plaintiff had originally disputed to TransUnion.

194.   Specifically, the Flagstar tradeline appeared in the November 10, 2020 TransUnion consumer report as follows:

**FLAGSTAR BK #646050372****
5151 CORPORATE DR
TROY, MI 48098-2639
(800) 968-7700**

| Date Opened: | 11/26/2012 | Balance: | | Pay Status: | >Account Included in Bankruptcy< |
| Responsibility: | Individual Account | Date Updated: | 09/03/2019 | | |
| Account Type: | Mortgage Account | High Balance: | $82,653 | Date Closed: | 09/03/2019 |
| Loan Type: | FMHA REAL ESTATE MORTGAGE | | | | |

**Remarks:** CHAPTER 13 BANKRUPTCY; LOAN MODIFIED NON GOVT
Estimated month and year that this item will be removed: 11/2025

195.   TransUnion either conducted reinvestigation reports on the above-mentioned disputes or it did not.

196.   Plaintiff isnot aware of receipt of any reinvestigation report from TransUnion.

197.   Plaintiff's new disclosure, pulled after the deadline provided by the FCRA, repeats the errors.

198.   Had a proper reinvestigation among Flagstar and TransUnion occurred, Plaintiff would have either received a reinvestigation report, or the updated disclosure – pulled several months after the deadline required by the FCRA to

conduct a reinvestigation – should have reflected the necessary changes to the tradeline.

199. Neither event in the above paragraph occurred.

200. Without access to the reinvestigation report, Plaintiff is unable to determine whether any such has been issued after several requests.

201. Defendants' post-investigation reporting is, assuming it was conducted, independently and jointly, false and misleading.

202. Defendants' post-investigation reporting is, assuming it was conducted, in derogation of the Metro 2 reporting standards, and that departure and failure to adhere to the adopted guidelines renders the reporting both false and materially misleading, as users of consumer reports assume Defendants' compliance with Metro 2 standards in reporting consumer information.

203. If no post-investigation reporting was conducted, TransUnion has violated the FCRA multiple times.

## INJURIES-IN-FACT

204. Defendants' actions and omissions have caused Plaintiff to lose time attempting to correct the false information on Plaintiff's consumer reports.

205.   The time spent by a person attempting to correct a false credit report constitutes a concrete injury for purposes of an FCRA claim. *Pinson v. JPMorgan Chase Bank, Nat'l Ass'n*, No. 16-17107, 2019 U.S. App. LEXIS 33662, at *5 (11th Cir. Nov. 12, 2019), citing Pedro v. Equifax, Inc., 868 F.3d 1275, 1280 (11th Cir. 2017).

206.   Defendants' actions and omissions have resulted in the illegitimate suppression of Plaintiff's FICO credit score and other credit rating model scores.

207.   The adverse effect on Plaintiff's credit score places Plaintiff at the material risk of being denied credit or receiving less favorable credit terms than she otherwise would.

208.   Further, the Courts have regularly held that allegations of lower credit scores, taken as true, are sufficient to allege a concrete injury-in-fact for the purposes of standing under Article III. *Pedro v. Equifax, Inc*., 868 F.3d 1275 (11th Cir. 2017) ("[H]er credit score dropped 100 points as a result of the challenged conduct. Because Pedro alleged that she suffered an injury in fact, she has standing to pursue her complaint."); *Diedrich v. Ocwen Loan Servicing, LLC*, 839 F.3d 583 (7th Cir. 2016) (standing where Plaintiffs alleged that they "have suffered damage to their credit and been forced to pay Ocwen greater payments and a higher interest rate");

*Santangelo v. Comcast Corp.*, 162 F. Supp. 3d 691 (N.D. Ill. 2016) ("a depleted credit score is sufficient to constitute an injury-in-fact for the purposes of establishing Article III standing"); *Binns v. Ocwen Loan Servicing, LLC*, No. 14-01764, 2015 U.S. Dist. LEXIS 132743, 2015 WL 5785693, at *9 (S.D. Ind. Sept. 30, 2015) ("injuries to plaintiffs' credit scores and reputations were considered intangible harms"); *Rothman v. U.S. Bank Nat'l Ass'n,* No. 13-03381, 2014 U.S. Dist. LEXIS 141100, 2014 WL 4966907, at *5 (N.D. Cal. Oct. 3, 2014) ("Injury to a credit score is sufficient to constitute 'actual damages'"); *Green v. RentGrow, Inc.*, No. 2:16cv421, 2016 U.S. Dist. LEXIS 166229 ("A decrease in credit score may still establish an injury in fact sufficient to confer standing"); *Adams v. Fifth Third Bank*, No. 3:16-CV-00218-TBR, 2017 U.S. Dist. LEXIS 18932 (W.D. Ky. Feb. 9, 2017) ("Plaintiffs' allegations of lower credit scores … are sufficient to allege a concrete injury-in-fact for the purposes of standing under Article III."); and, *Coulbertson v. Experian Info. Sols., Inc.*, No. 16-cv-05672-RS, 2017 U.S. Dist. LEXIS 69484 (N.D. Cal. Mar. 24, 2017) ("At a minimum, Coulbertson has alleged a sufficient injury-in-fact through her claim that her credit score suffered as a result of the credit report she disputes").

209.   Defendants' actions and omissions have resulted in the illegitimate suppression of Plaintiff's credit-based insurance scores.

210.   The adverse effect on Plaintiff's credit-based insurance scores places Plaintiff at the material risk of being denied insurance or receiving less favorable insurance rates and terms than she otherwise would.

211.   Defendants' actions and omissions have caused Plaintiff's credit reports to falsely indicate that Plaintiff's Mortgage is closed, suggesting that the account was discharged in Plaintiff's Bankruptcy Case, thereby denying Plaintiff the positive effect of the reporting of their Mortgage payments over the course of the Chapter 13.

212.   This false impression creates a material risk that Plaintiff would be denied credit, receive less favorable credit treatment than Plaintiff otherwise would, or receive other unfavorable treatment than Plaintiff otherwise would, from any viewer of Plaintiff's Equifax and TransUnion credit reports engaged in judgment-based lending.

213.   Plaintiff's pending Bankruptcy Case does not preclude Plaintiff from obtaining credit. On the contrary, it is not uncommon for consumers in an active

57

Chapter 13 Bankruptcy Case to access the credit markets for the replacement or acquisition of vehicles and the refinancing of debt.[1]

214.   In point of fact, the FHA has a program for approving borrowers who are still making payments in a pending/active Chapter 13 Bankruptcy. U.S. Department of Housing and Urban Development, HUD 4155.1, Mortgage Credit Analysis for Mortgage Insurance (March 24, 2011) p. 4-C-13, available at *https://www.hud.gov/sites/documents/41551HSGH.PDF*.                    See                    also, *https://www.fha.com/fha_requirements_credit*.

215.   Consumers in bankruptcy often have high-interest mortgages due to the financial circumstances that led to bankruptcy in the first place; once the bankruptcy process has provided some stability, they may be eligible for more favorable terms if their credit otherwise supports it.

216.   Thus, complete and accurate reporting by CRAs and furnishers is of paramount importance.

---

[1] The Federal Rules of Bankruptcy Procedure specifically provide for the method by which consumers in an active bankruptcy obtain approval for obtaining credit. FRBP 4001(c).

217.  The existence of consumer reports which inaccurately report Plaintiff's Mortgage, and/or falsely suggest that Plaintiff's Mortgage has been discharged or is subject to discharge, make it inherently more difficult and more expensive for Plaintiff to refinance the Mortgage.

218.  For example, for Plaintiff to obtain an FHA loan, the FHA's general credit policy requires lenders to obtain Plaintiff's full credit report–not just Plaintiff's credit scores, and analyze Plaintiff's credit history, liabilities, and debts to determine creditworthiness. U.S. Dep't of Hous. and Urban Dev., *Handbook 4000.1, FHA Single Family Housing Policy Handbook*, 250 (December 30, 2016), *https://www.hud.gov/sites/documents/40001HSGH.PDF* (January 16, 2018) archived at https://perma.cc/UE3H-N3BS.

219.  To obtain an FHA refinance of a potential mortgage, the lender must be able to verify Plaintiff's payments for a potential mortgage for the preceding 12 months. *Id*. at 409.

220.  In the event this information cannot be obtained via the consumer's credit report, FHA guidelines mandate that the consumer meet this burden through other, more difficult and time-consuming means. *Id*. at 410.

221.   Plaintiff's correct payment history would be included in Plaintiff's Equifax and TransUnion credit reports if Defendants had conducted appropriate investigations of Plaintiff's disputes.

222.   However, because the Mortgage is falsely reported in Plaintiff's Equifax and TransUnion credit reports as closed, Plaintiff will be forced to pursue alternative, more time-consuming, and more expensive means of demonstrating her payment history to a potential lender.

223.   Because Defendants failed to comply with their duties under the FCRA as detailed herein, Plaintiff will need to obtain and provide verification of the Mortgage, bank statements, and/or other documents to demonstrate his payment history for the previous 12 months.

224.   This requires Plaintiff to expend more time, effort, and money due to Defendants' failures to abide by their obligations under the FCRA.

## **DAMAGES**

### **Actual Damages**

225.   As a result of Defendants' actions and omissions, Plaintiff has suffered actual damages.

60

226.   These damages include out-of-pocket expenses incurred as a result of Defendants' wrongful representations regarding the Debt and Mortgage, and Defendants' failures to abide by their obligations under the FCRA.

227.   Plaintiff has suffered a decrease in Plaintiff's credit score as a result of Defendants' wrongful representations regarding the Debt and Mortgage, and Defendants' failures to abide by their obligations under the FCRA.

228.   Plaintiff has also experienced aggravation, frustration, and stress due to the fact that Defendants are thwarting Plaintiff from receiving the Fresh Start guaranteed by bankruptcy process and discharge.

## **Statutory and Punitive Damages**

229.   At the time Defendants reported the information at issue in this matter, each Defendant had actual notice that the information it was reporting regarding Plaintiff and the Debt and Mortgage was false, deceptive, and misleading.

230.   For example, Plaintiff included corroborating documents with her disputes, including the Chapter 13 Plan, the Order Confirming Plan, Flagstar's Proof of Claim, and the Notice of Meeting of Creditors, which was more than sufficient to establish that the disputed information was being reported inaccurately.

231. Defendants would have further reason to doubt the accuracy of reporting Plaintiff's Mortgage in such a way as to indicate the Mortgage was discharged in bankruptcy (as described *supra*), because the *Bankruptcy Case itself* has not yet been discharged (a fact which is itself apparent from the face of Plaintiff's credit reports). Even if the Mortgage account was eligible for discharge (which it is not), it clearly could not have been discharged while the bankruptcy is still ongoing.

232. Finally, Plaintiff is informed and believes that Flagstar has previously provided Equifax and TransUnion with information containing these same (or substantially similar) errors on a multitude of occasions, thus placing Equifax and TransUnion on notice of Flagstar's unreliability, and deficiencies in Flagstar's systems and procedures, which have repeatedly caused these errors to propagate in data provided by Flagstar and elude corrected upon dispute by consumers.

233. Finally, Plaintiff is informed and believes that Sterling has previously provided Equifax with information containing these same (or substantially similar) errors on a multitude of occasions, thus placing Equifax on notice of Sterling's unreliability, and deficiencies in Sterling's systems and procedures, which have repeatedly caused these errors to propagate in data provided by Sterling and elude correction upon dispute by consumers.

234.   Each Defendant had more than enough information to correct its false, deceptive, and misleading reporting.

235.   Despite that, Defendants continued to report the false, deceptive, and misleading information regarding Plaintiff and the Debt and Mortgage.

236.   Each Defendant failed to correct its false, deceptive, and misleading reporting, and in fact continued to report false, deceptive, and misleading information regarding Plaintiff, as described herein.

237.   Accordingly, Defendants' conduct was willful.

238.   As a result of Defendants' willful actions and omissions, Plaintiff is eligible to recover actual damages or statutory damages of up to $1,000, potential punitive damages, costs of this action, and reasonable attorney's fees pursuant to 15 U.S.C. §§ 1681n and/or 1681o.

## CAUSES OF ACTION

## COUNT I

### VIOLATIONS OF THE FAIR CREDIT REPORTING ACT
### 15 U.S.C. §§ 1681e(b) and 1681i
### Equifax Information Services, LLC

239.   Plaintiff incorporates by reference the preceding paragraphs as though fully stated herein.

240.   Pursuant to 15 U.S.C. § 1681e(b), Equifax is responsible for following reasonable procedures to assure maximum possible accuracy of information whenever it prepares consumer reports about Plaintiff.

241.   Pursuant to 15 U.S.C. § 1681i(a)(1)(A), Equifax had an affirmative duty to independently investigate the dispute submitted by Plaintiff.

242.   Pursuant to 15 U.S.C. § 1681i(a)(2), Equifax was required to communicate the specifics of Plaintiff's dispute to Flagstar and Sterling, including the forwarding of any documents provided by Plaintiff in support of that dispute.

243.   A consumer reporting agency's reasonable reinvestigation must be a good faith effort to ascertain the truth; a reasonable reinvestigation must answer the substance of the consumer's dispute, and may not merely be a *pro forma* record review that simply begs the question.

244.   A reasonable reinvestigation clearly requires some degree of careful inquiry, and more than just a superficial inquiry.

245.   The reasonableness of a reinvestigation under the FCRA is generally a question of fact for the jury.

246.   In order to conduct a reasonable reinvestigation, and pursuant to 15 U.S.C. § 1681i(a)(4), Equifax was required to review and consider all relevant information submitted by Plaintiff.

247.   Plaintiff's dispute was clear and unambiguous as to the inaccuracies of Equifax's reporting of the Debt.

248.   Plaintiff's dispute was clear and unambiguous as to the inaccuracies of Equifax's reporting of the Mortgage.

249.   Plaintiff provided all the relevant information necessary for Equifax to conduct a reasonable reinvestigation, and correct the inaccuracies in its reporting.

250.   Equifax breached its duties as described herein.

251.   If Equifax had conducted a reasonable reinvestigation of Plaintiff's dispute, Equifax would have reviewed and considered all of the information Plaintiff submitted in her disputes, and would have easily detected that what was being reported regarding the Debt and Mortgage was factually incorrect, inaccurate, and misleading.

252.   If Equifax had conducted a reasonable reinvestigation of Plaintiff's disputes, the Flagstar tradeline on Plaintiff's Equifax consumer report would have been appropriately corrected.

65

253.   If Equifax had conducted a reasonable reinvestigation of Plaintiff's disputes, the Sterling tradeline on Plaintiff's Equifax consumer report would have been appropriately corrected.

254.   Due to Equifax's failures to follow reasonable procedures to assure maximum possible accuracy of information, and failures to conduct a reasonable reinvestigation of Plaintiff's disputes, the false and misleading information in Plaintiff's credit file and on Plaintiff's Equifax report was not appropriately modified.

255.   Equifax had all the information necessary to correct its reporting. Despite that, Equifax failed to correct the false, disputed information, in the face of clear evidence that its reporting was false and misleading. That failure indicates that Equifax's reinvestigation procedures were not reasonable.

256.   The fact that Equifax had all the information necessary to correct its reporting, yet failed to do so in an appropriate manner, further indicates that Equifax recklessly disregarded Plaintiff's disputes and the requirements of the FCRA, amounting to a willful violation of the statute.

257.   Upon information and belief, Equifax has prepared consumer reports containing the incomplete and inaccurate information at issue, and has published the incomplete and inaccurate information to third parties.

258.   Alternatively, Equifax exceeded the time limit provided in the FCRA to timely provide a reinvestigation report on one or multiple occasions.

259.   Failing to provide a reinvestigation report one or multiple times does not constitute reasonable procedures under 15 U.S.C. § 1681e(b).

260.   Equifax willfully, or in the alternative negligently, violated 15 U.S.C. § 1681e(b) by failing to follow reasonable procedures to assure the maximum possible accuracy of information concerning Plaintiff in her consumer reports, in reckless disregard of the statutory requirements, Plaintiff's disputes, and the publicly recorded Bankruptcy Case filings.

261.   Equifax willfully, or in the alternative negligently, violated 15 U.S.C. § 1681i in multiple ways, including without limitation, by failing to properly notify Flagstar and Sterling of Plaintiff's disputes, by failing to provide Flagstar and Sterling with all the supporting information/documents included with Plaintiff's disputes, by failing to conduct a reasonable reinvestigation of Plaintiff's disputes, and by failing thereafter to appropriately modify information in Plaintiff's file and

on her consumer reports, in reckless disregard of the statutory requirements, Plaintiff's disputes, and the publicly recorded Bankruptcy Case filings.

262.   As a result of Equifax's violations of 15 U.S.C. §§ 1681e(b) and 1681i, Plaintiff has suffered actual damages as described herein. Plaintiff is, therefore, entitled to recover actual damages from Equifax pursuant to 15 U.S.C. §§ 1681n and 1681o.

263.   Equifax's actions and omissions were willful, rendering Equifax liable to Plaintiff for punitive damages and/or statutory damages pursuant to 15 U.S.C. § 1681n.

264.   Plaintiff is entitled to recover costs and attorneys' fees from Equifax pursuant to 15 U.S.C. §§ 1681n and 1681o.

## COUNT II

### VIOLATIONS OF THE FAIR CREDIT REPORTING ACT
### 15 U.S.C. §§ 1681e(b) and 1681i
### Trans Union LLC

265.   Plaintiffs incorporate by reference paragraphs 1 through 238 as though fully stated herein.

266.   Pursuant to 15 U.S.C. § 1681e(b), TransUnion is responsible for following reasonable procedures to assure maximum possible accuracy of information whenever it prepares consumer reports about Plaintiff.

267.   Pursuant to 15 U.S.C. § 1681i(a)(1)(A), TransUnion had an affirmative duty to independently investigate the dispute submitted by Plaintiff.

268.   Pursuant to 15 U.S.C. § 1681i(a)(2), TransUnion was required to communicate the specifics of Plaintiff's disputes to Flagstar, including the forwarding of any documents provided by Plaintiff in support of that dispute.

269.   A consumer reporting agency's reasonable reinvestigation must be a good faith effort to ascertain the truth; a reasonable reinvestigation must answer the substance of the consumer's dispute, and may not merely be a *pro forma* record review that simply begs the question.

270.   A reasonable reinvestigation clearly requires some degree of careful inquiry, and more than just a superficial inquiry.

271.   The reasonableness of a reinvestigation under the FCRA is generally a question of fact for the jury.

272.   In order to conduct a reasonable reinvestigation, and pursuant to 15 U.S.C. § 1681i(a)(4), TransUnion was required to review and consider all relevant information submitted by Plaintiff.

273.   Plaintiff's disputes were clear and unambiguous as to the inaccuracies of TransUnion's reporting of the Mortgage.

274.   Plaintiff provided all the relevant information necessary for TransUnion to conduct a reasonable reinvestigation, and correct the inaccuracies in its reporting.

275.   TransUnion breached its duties as described herein.

276.   If TransUnion had conducted a reasonable reinvestigation of Plaintiff's disputes, TransUnion would have reviewed and considered all of the information Plaintiff submitted in her disputes, and would have easily detected that what was being reported regarding the Mortgage was factually incorrect, inaccurate, and misleading.

277.   If TransUnion had conducted a reasonable reinvestigation of Plaintiff's disputes, the Flagstar tradeline on Plaintiff's TransUnion consumer report would have been appropriately corrected.

70

278. Due to TransUnion's failures to follow reasonable procedures to assure maximum possible accuracy of information, and failures to conduct a reasonable reinvestigation of Plaintiff's disputes, the false and misleading information in Plaintiff's credit file and on Plaintiff's TransUnion report was not appropriately modified.

279. TransUnion had all the information necessary to correct its reporting. Despite that, TransUnion failed to correct the false, disputed information, in the face of clear evidence that its reporting was false and misleading. That failure indicates that TransUnion's reinvestigation procedures were not reasonable.

280. The fact that TransUnion had all the information necessary to correct its reporting, yet failed to do so in an appropriate manner, further indicates that TransUnion recklessly disregarded Plaintiff's disputes and the requirements of the FCRA, amounting to a willful violation of the statute.

281. Upon information and belief, TransUnion has prepared consumer reports containing the incomplete and inaccurate information at issue, and has published the incomplete and inaccurate information to third parties.

282. Alternatively, TransUnion exceeded the time limit provided in the FCRA to timely provide a reinvestigation report on one or multiple occasions.

283.   Failing to provide a reinvestigation report one or multiple times does not constitute reasonable procedures under 15 U.S.C. § 1681e(b).

284.   TransUnion willfully, or in the alternative negligently, violated 15 U.S.C. § 1681e(b) by failing to follow reasonable procedures to assure the maximum possible accuracy of information concerning Plaintiff in her consumer reports, in reckless disregard of the statutory requirements, Plaintiff's disputes, and the publicly recorded Bankruptcy Case filings.

285.   TransUnion willfully, or in the alternative negligently, violated 15 U.S.C. § 1681i in multiple ways, including without limitation, by failing to properly notify Flagstar of Plaintiff's disputes, by failing to provide Flagstar with all the supporting information/documents included with Plaintiff's disputes, by failing to conduct a reasonable reinvestigation of Plaintiff's disputes, and by failing thereafter to appropriately modify information in Plaintiff's file and on her consumer reports, in reckless disregard of the statutory requirements, Plaintiff's disputes, and the publicly recorded Bankruptcy Case filings.

286.   As a result of TransUnion's violations of 15 U.S.C. §§ 1681e(b) and 1681i, Plaintiff has suffered actual damages as described herein. Plaintiff is,

therefore, entitled to recover actual damages from TransUnion pursuant to 15 U.S.C. §§ 1681n and 1681o.

287. TransUnion's actions and omissions were willful, rendering TransUnion liable to Plaintiff for punitive damages and/or statutory damages pursuant to 15 U.S.C. § 1681n.

288. Plaintiff is entitled to recover costs and attorneys' fees from TransUnion pursuant to 15 U.S.C. §§ 1681n and 1681o.

## COUNT III

### VIOLATIONS OF THE FAIR CREDIT REPORTING ACT
### 15 U.S.C. § 1681s-2(b)
### Flagstar Bancorp, Inc.

289. Plaintiff incorporates by reference paragraphs 1 through 238 as though fully stated herein.

290. Pursuant to 15 U.S.C. § 1681s-2(a), Flagstar is responsible for providing accurate information whenever it furnishes information to any consumer reporting agencies.

291. Upon information and belief, Equifax and TransUnion timely notified Flagstar of Plaintiff's disputes, and provided Flagstar with all the relevant information that Plaintiff had submitted.

292.   Pursuant to 15 U.S.C. § 1681s-2(b), Flagstar had a duty to investigate Plaintiff's disputes and accurately report its findings to Equifax and TransUnion.

293.   A furnisher's investigation must be a good faith effort to ascertain the truth; a reasonable investigation must answer the substance of the consumer's dispute, and may not merely be a *pro forma* record review that simply begs the question.

294.   A reasonable investigation clearly requires some degree of careful inquiry, and more than just a superficial inquiry.

295.   The reasonableness of an investigation under the FCRA is generally a question of fact for the jury.

296.   In order to conduct a reasonable investigation, and pursuant to 15 U.S.C. § 1681s-2(b), Flagstar was required to review and consider all relevant information submitted by Plaintiff to Equifax and TransUnion.

297.   Plaintiff's disputes were clear and unambiguous as to the inaccuracies of reporting the Mortgage as closed and with a blank balance.

298.   Flagstar breached its duties as described herein.

299.   If Flagstar had conducted a reasonable investigation of Plaintiff's disputes, Flagstar would have reviewed and considered all of the information

74

Plaintiff submitted to Equifax and TransUnion in her disputes, and would have easily detected that what was being reported regarding the Mortgage was factually incorrect, inaccurate, and misleading.

300.   If Flagstar had conducted a reasonable investigation of Plaintiff's disputes, the tradeline on Plaintiff's consumer reports would have been corrected accordingly.

301.   Due to Flagstar's failures to provide accurate information, and failures to conduct reasonable investigations of Plaintiff's disputes, the false and misleading information in Plaintiff's credit file and on Plaintiff's reports as described herein was not appropriately modified.

302.   Flagstar had all the information necessary to correct its reporting. Despite that, Flagstar failed to suitably correct its reporting, in the face of clear evidence that it was false and misleading. That failure indicates that Flagstar's investigation procedures were not reasonable.

303.   The fact that Flagstar had all the information necessary to correct its reporting, yet failed to appropriately do so, further indicates that Flagstar recklessly disregarded Plaintiff's disputes and the requirements of the FCRA, amounting to a willful violation of the statute.

75

304.   Flagstar willfully, or in the alternative negligently, violated 15 U.S.C. § 1681s-2(b) by failing to conduct a reasonable investigation upon receiving notice of Plaintiff's disputes from Equifax and TransUnion, by failing to appropriately modify the disputed information, and/or by failing to appropriately report the results of its investigation, in reckless disregard of the statutory requirements, Plaintiff's disputes, and the publicly recorded Bankruptcy Case filings.

305.   As a result of Flagstar's violations of 15 U.S.C. § 1681s-2(b), Plaintiff has suffered actual damages as stated herein. Plaintiff is, therefore, entitled to recover actual damages from Flagstar under 15 U.S.C. §§ 1681n and 1681o.

306.   Flagstar's actions and omissions were willful, rendering Flagstar liable to Plaintiff for punitive damages and/or statutory damages pursuant to 15 U.S.C. § 1681n.

307.   Plaintiff is entitled to recover costs and attorneys' fees from Flagstar pursuant to 15 U.S.C. §§ 1681n and 1681o.

## COUNT IV

**VIOLATIONS OF THE FAIR CREDIT REPORTING ACT**
**15 U.S.C. § 1681s-2(b)**
**Sterling Jewelers Inc. (Delaware) a/k/a and d/b/a Kay Jewelers**

308.   Plaintiff incorporates by reference paragraphs 1 through 238 as though fully stated herein.

309.   Pursuant to 15 U.S.C. § 1681s-2(a), Sterling is responsible for providing accurate information whenever it furnishes information to any consumer reporting agencies.

310.   Upon information and belief, Equifax timely notified Sterling of Plaintiff's disputes, and provided Sterling with all the relevant information that Plaintiff had submitted.

311.   Pursuant to 15 U.S.C. § 1681s-2(b), Sterling had a duty to investigate Plaintiff's disputes and accurately report its findings to Equifax.

312.   A furnisher's investigation must be a good faith effort to ascertain the truth; a reasonable investigation must answer the substance of the consumer's dispute, and may not merely be a *pro forma* record review that simply begs the question.

313.   A reasonable investigation clearly requires some degree of careful inquiry, and more than just a superficial inquiry.

314.   The reasonableness of an investigation under the FCRA is generally a question of fact for the jury.

315.   In order to conduct a reasonable investigation, and pursuant to 15 U.S.C. § 1681s-2(b), Sterling was required to review and consider all relevant information submitted by Plaintiff to Equifax.

316.   Plaintiff's disputes were clear and unambiguous as to the inaccuracies of reporting the Debt as charged off with no mention of Plaintiff's Bankruptcy Case.

317.   Sterling breached its duties as described herein.

318.   If Sterling had conducted a reasonable investigation of Plaintiff's disputes, Sterling would have reviewed and considered all of the information Plaintiff submitted to Equifax in her disputes, and would have easily detected that what was being reported regarding the Debt was factually incorrect, inaccurate, and misleading.

319.   If Sterling had conducted a reasonable investigation of Plaintiff's disputes, the tradeline on Plaintiff's consumer reports would have been corrected accordingly.

320.   Due to Sterling's failures to provide accurate information, and failures to conduct reasonable investigations of Plaintiff's disputes, the false and misleading information in Plaintiff's credit file and on Plaintiff's reports as described herein was not appropriately modified.

321.   Sterling had all the information necessary to correct its reporting. Despite that, Sterling failed to suitably correct its reporting, in the face of clear evidence that it was false and misleading. That failure indicates that Sterling's investigation procedures were not reasonable.

322.   The fact that Sterling had all the information necessary to correct its reporting, yet failed to appropriately do so, further indicates that Sterling recklessly disregarded Plaintiff's disputes and the requirements of the FCRA, amounting to a willful violation of the statute.

323.   Sterling willfully, or in the alternative negligently, violated 15 U.S.C. § 1681s-2(b) by failing to conduct a reasonable investigation upon receiving notice of Plaintiff's disputes from Equifax, by failing to appropriately modify the disputed information, and/or by failing to appropriately report the results of its investigation, in reckless disregard of the statutory requirements, Plaintiff's disputes, and the publicly recorded Bankruptcy Case filings.

324.   As a result of Sterling's violations of 15 U.S.C. § 1681s-2(b), Plaintiff has suffered actual damages as stated herein. Plaintiff is, therefore, entitled to recover actual damages from Sterling under 15 U.S.C. §§ 1681n and 1681o.

325.   Sterling's actions and omissions were willful, rendering Sterling liable to Plaintiff for punitive damages and/or statutory damages pursuant to 15 U.S.C. § 1681n.

326.   Plaintiff is entitled to recover costs and attorneys' fees from Sterling pursuant to 15 U.S.C. §§ 1681n and 1681o.

## **TRIAL BY JURY**

327.   Plaintiff is entitled to and hereby requests a trial by jury.

**WHEREFORE**, Plaintiff prays that judgment be entered in her favor and against Defendants, jointly and severally, for:

a)   Plaintiff's actual damages;

b)   Statutory damages of $1,000 per violation of the FCRA pursuant to 15 U.S.C. § 1681n;

c)   Punitive damages pursuant to 15 U.S.C. § 1681n;

d)   Reasonable attorney's fees and costs pursuant to 15 U.S.C. §§ 1681n and/or 1681o; and

e)      Such other and further relief as may be just and proper.

Respectfully submitted this 8th day of June, 2021.

**BERRY AND ASSOCIATES**

*/s/ Joseph L. Erkenbrack*

Matthew T. Berry
Georgia Bar No. 055663
*matt@mattberry.com*

Joseph L. Erkenbrack
Georgia Bar No. 801728
jerkenbrack@mattberry.com

Berry & Associates
2751 Buford Highway, Suite 600
Atlanta, Georgia 30324

OFFICE      (678) 996-5172
FAX          (678) 996-5198

Counsel for Plaintiff

81